IN RE THE CONSTITUTIONAL CONVENTION.

The Constitution of the State of Rhode Island can be lawfully amended or changed only in the mode which itself prescribes.

ARTICLE 13 of the Constitution of the State of Rhode Island is as follows :

" The General Assembly may propose amendments to this Constitution by the votes of a majority of all the members elected to each house.   Such propositions for amendment shall be published in the newspapers, and printed copies of them shall be sent by the secretary of state, with the names of all the members who shall have voted thereon, with the yeas and nays, to all the town and city clerks in the state.   The said propositions shall be, by said clerks, inserted in the warrants or notices by them issued for warning the next annual town and ward meetings in April ; and the clerks shall read said propositions to the electors when thus assembled, with the names of all the representatives and senators who shall have voted thereon, with the yeas and nays, before the election of senators and representatives shall be had.   If a majority of all the members elected to each house, at said annual meeting, shall approve any proposition thus made, the same shall be published and submitted to the electors in the mode provided in the act of approval ; and if then approved by three fifths of the electors of the State present and voting thereon in town and ward meetings, it shall become a part of the Constitution of the State."

Article 10, section 3, provides, that " the judges of the Supreme

Court shall . . . give their written opinion upon any question of law whenever requested . . . by either house of the General Assembly."

March 20, 1883, the Senate of the State adopted the following resolution :

" Whereas, a difference of opinion has arisen among members of the General Assembly,

" I. As to the legal competency thereof under the Constitution of the State to call upon the electors to elect members to constitute a convention to frame a new Constitution of the State, and to provide that the new Constitution should be submitted for adoption, either to the qualified electors of the State, or to the persons who would be entitled to vote under said new Constitution, for adoption, and if a majority of such electors or persons voting should vote in favor thereof, whether the new Constitution would then become the legally adopted Constitution of the State and be binding as such upon all of the people thereof.

" II. As to whether it is legally competent for the General Assembly to submit to the qualified electors the question whether said electors will call a convention to frame a new Constitution, and to provide by law if a majority of the electors voting upon said question shall vote in favor of calling such convention, that the same be held, and the new Constitution framed by said Convention be submitted to the electors for their adoption, either to the electors qualified by law, or to the persons who may be qualified to vote under such new Constitution, and whether if a majority of the electors, or persons voting thereon, vote for the adoption of such Constitution, whether the. Constitution so to be framed and adopted would be the legal Constitution of the State, and as such be binding upon all the people thereof.

" And whereas, the existing Constitution provides that either house of the General Assembly may require the opinion of the judges of the Supreme Court upon any question of law, it is therefore hereby

" Resolved, that the said judges of the said Supreme Court be, and they hereby are requested without unnecessary delay to give their opinion to the Senate upon the two questions stated in the preamble hereto, upon which differences of opinion have arisen between the members of this General Assembly.

" Resolved, that His Excellency the Governor be, and he hereby is requested to forward copies of the preceding preamble and resolution to each of the judges of the said Supreme Court.

OPINION OF THE COURT.

*March* 30, 1883.

*To the Honorable the Senate of the State of Rhode Island and Providence Plantations :*

We received from your Honors on the 24th inst. a resolution requesting our opinion in regard to the legal competency of the General Assembly to call a convention for the revision of the Constitution. In reply we have to say that we are of opinion that the mode provided in the Constitution for the amendment thereof is the only mode in which it can be constitutionally amended. The ordinary rule is that where power is given to do a thing in a particular way, there the affirmative words, marking out the particular way, prohibit all other ways by implication, so that the particular way is the only way in which the power can be legally executed. The rule was recently recognized by the Supreme Court of the United States in *Smith* v. *Stevens*, 10 Wall. 321. There by act of Congress lands were ceded to Indians with power to sell them, or parts of them, in a particular manner, and the court held that a sale in any other manner was void. The rule was likewise recently recognized by the English Court of Exchequer in a case in which it was thus expressed : " If authority is given expressly, though by affirmative words, upon a defined condition, the expression of that condition excludes the doing of the act authorized under other circumstances than those so defined: '*Expressio unius est exclusio alterius.*' " *North Stafford Steel &c. Co.* v. *Ward*, L. R. 3 Exch. 172, 177. Cases to the same point might be indefinitely multiplied. 1 Kent Comment. *467, note *d ;* 1 Sugden on Powers, 258 *et sq.; City of New Haven* v. *Whitney*, 36 Conn. 373; *District Township of the City of Dubuque* v. *The City of Dubuque*, 7 Iowa, 262. It has been claimed, indeed, that the rule, though applicable in the interpretation of statutes, deeds, wills, and other ordinary instruments, is inapplicable in the interpretation of a

state constitution. Those who assert this difference, however, do not appear to have any reason to give for it but this, namely: that under stress of strong political excitement, the rule, if it exists, is pretty sure to be disregarded, as past experience proves, and therefore it is better to conclude that it does not exist. We do not consider the reason satisfactory. The rule is simply a guide to the meaning of language when used in a particular way, and we do not see why it is not as trustworthy a guide to the meaning when the language so used occurs in a state constitution, as when it occurs in a statute or a will. Men do not put away their spontaneous and habitual modes of expressing themselves merely because they are engaged in the unaccustomed work of framing or adopting a constitution. In this view we are not without precedent. One of the greatest of modern jurists, Chief Justice Shaw, was of the same way of thinking, and, conjointly with his associates, declared it to be his opinion that the Constitution of Massachusetts is constitutionally amendable only as therein provided.[1] The provision for amendment in our Constitution is singularly explicit. The proposed amendment is first to pass the two houses of the General Assembly by a majority of the members elected; it is then to be published, with the vote thereon, in the newspapers, and otherwise brought to the attention of the people; it is then to pass the assembly elected after such publication by a majority of both houses; and finally it is to be submitted to the approval of the electors, and if it be approved by three fifths of the electors voting, and not otherwise, it is to become incorporated in the Constitution. Evidently the purpose was to insure the calm and considerate action of both the assembly and the people. It was to pass two assemblies, so that the members of the second, elected after publication, might, if the electors thought proper, be elected specially to consider it. The popular mind was not to be taken by surprise or to be carried away by any sudden sentiment, but it was to act deliberately after reflection. To this end a three fifths vote was required for approval. The object was not to hamper or baffle the popular will, but to insure its full expression. Our ancestors knew, what we all know, that in spite of all precautions a majority may be worked up for an occasion, which is not

[1] *Opinion of the Justices*, 6 Cush. 573.

the true and permanent majority. They also knew, what we all know, that many electors, perfectly satisfied with the existing state of things, stay away from the polls on election day from mere inertness of temperament. It is inconceivable to us, that they would have elaborated so guarded a mode of amendment, unless they had intended to have it exclusive and controlling. They doubtless did so intend, and if they did, we cannot say they did not, simply because since then the constitutions of other states, having similar provisions, have been amended through the medium of conventions. The framers of our Constitution could not fore-know this action in other states, and therefore cannot have been influenced by it. If our Constitution had no provision for amend-ment, then, indeed, a power in the assembly to call a convention or to initiate amendments in some other manner might be implied *ex necessitate*. The assembly, under the charter, exercised such a power because the charter had no such provision; though it is proper to remark that under the charter the legislative power of the assembly was practically unlimited. Again, if the provision for amendment was impracticable, there might be, if no legal rea-son, yet some excuse for disregarding it. But it is practicable, as a successful resort to it in several instances has demonstrated. The only things which can be said against it are that it is dila-tory, and that it requires the assent of more than a bare majority. But these are the very things which recommended it to its au-thors, and therefore they cannot be alleged as reasons for believing that they did not mean it to be exclusive and controlling.

Our Constitution is, by its own express declaration, the supreme law of the State; any law inconsistent with it is void, and, there-fore, if the provision which it contains for its own amendment is exclusive, implying a prohibition of amendments in any other manner, then, of course, any act of the assembly providing for a convention to amend the Constitution is unconstitutional and void.

An argument in favor of a convention has been suggested which is not specifically met in the preceding. It is this, namely: that though the General Assembly has no power to introduce amend-ments and carry them to their consummation in any manner not provided in the Constitution, it nevertheless has power to call a convention to frame a new constitution for submission to the peo-

ple.  The argument is, in our opinion rather specious than sound. The convention, if called, would be confined by the Constitution of the United States to the formation of a constitution for a republican form of government, and our present Constitution contains the fundamental provisions, the great ground plan, of such a form of government as it is known throughout the Union.  Any changes which are in contemplation are merely changes of superstructure or detail.  Our Constitution, too, contains in its Bill of Rights the great historic safeguards of liberty and property, which certainly no convention would venture either materially to alter or to abolish.  Any new constitution, therefore, which a convention would form, would be a new constitution only in name; but would be in fact our present Constitution amended.  It is impossible for us to imagine any alteration, consistent with a republican form of government, which cannot be effected by specific amendment as provided in the Constitution.

Again, it has been maintained that the General Assembly has power to call a convention under section 10, of article 4, which provides that "the General Assembly shall continue to exercise the powers they have heretofore exercised, unless prohibited in this Constitution."  But, under this section, the General Assembly can only exercise powers which are not prohibited; and, if the provision for amendment is, as we think it is, exclusive, then a power to call a convention is prohibited by implication, and, as was clearly shown in *Taylor* v. *Place*, 4 R. I. 324, an implied is as effectual as an express prohibition.

Finally, it has been contended that there is a great unwritten common law of the states, which existed before the Constitution, and which the Constitution was powerless to modify or abolish, under which the people have the right, whenever invited by the General Assembly, and as some maintain, without any invitation, to alter and amend their constitutions.  If there be any such law, for there is no record of it, or of any legislation or custom in this State recognizing it, then it is, in our opinion, rather a law, if law it can be called, of revolutionary than of constitutional change.  Our Constitution is, as already stated, by its own terms, " the supreme law of the State."  We know of no law, except the Constitution and laws of the United States, which is paramount to it.

We think the foregoing is in effect, if not in form, an answer to the questions propounded to us in the resolutions. The questions are extremely important, and we should have been glad of an opportunity to give them a more careful study, but under the request of the Senate for our opinion, "without any unnecessary delay," we have thought it to be our duty to return our opinion as soon as we could, without neglecting other duties, prepare it.

<div style="text-align:right">

THOMAS DURFEE,

CHARLES MATTESON,

JOHN H. STINESS,

P. E. TILLINGHAST,

G. M. CARPENTER, JUN.